UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCUS ELLIOT KING,

        Petitioner,

                        CASE NO. 2:13-CV-14865
v.                          JUDGE GERSHWIN A. DRAIN
                        MAGISTRATE JUDGE PAUL J. KOMIVES

CINDI CURTIN,

        Respondent.

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

| | | | |
|---|---|---|---|
| I. | | RECOMMENDATION .................................................................. | 2 |
| II. | | REPORT .................................................................. | 2 |
| | A. | *Procedural History* .................................................................. | 2 |
| | B. | *Factual Background Underlying Petitioner's Conviction* ............................... | 4 |
| | C. | *Standard of Review* .................................................................. | 10 |
| | D. | *Sentencing Claims (Claim I-V)* ....................................................... | 12 |
| | | 1.    *Guideline Scoring (Claim I)* ............................................ | 13 |
| | | 2.    *Failure to Consider Mitigating Evidence (Claim II)* ...................... | 14 |
| | | 3.    *Inaccurate Information (Claims II & III)* ................................ | 15 |
| | | 4.    *Apprendi (Claim III)* .................................................. | 16 |
| | | 5.    *Proportionality (Claim III)* ............................................ | 21 |
| | | 6.    *Jail Credit (Claim IV)* ................................................ | 25 |
| | | 7.    *Imposition of Fees (Claim V)* ........................................... | 29 |
| | E. | *Sufficiency of the Evidence (Claim VI)* ............................................... | 31 |
| | | 1.    *Clearly Established Law* ................................................ | 31 |
| | | 2.    *Analysis* .............................................................. | 33 |
| | F. | *Counsel Claims (Claims I-V, VII)* ..................................................... | 35 |
| | | 1.    *Substitute Counsel (Claim VII)* ........................................ | 35 |
| | |       a. Clearly Established Law ............................................. | 35 |
| | |       b. Analysis ........................................................... | 37 |
| | | 2.    *Ineffective Assistance (Claims I-V)* .................................... | 39 |
| | |       a. Clearly Established Law ............................................. | 39 |
| | |       b. Analysis ........................................................... | 41 |
| | G. | *Recommendation Regarding Certificate of Appealability* ............................... | 42 |
| | | 1.    *Legal Standard* ........................................................ | 42 |
| | | 2.    *Analysis* .............................................................. | 43 |
| | H. | *Conclusion* .................................................................. | 44 |
| III. | | NOTICE TO PARTIES REGARDING OBJECTIONS ................................... | 45 |

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Marcus Elliot King is a state prisoner, currently confined at the Oaks Correctional Facility in Manistee, Michigan.

2.      On August 30, 2011, petitioner was convicted of armed robbery, MICH. COMP. LAWS § 750.529; possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b; and entry of a building without permission, MICH. COMP. LAWS § 750.515, following a jury trial in the Oakland County Circuit Court.  On September 29, 2011, he was sentenced as a fourth habitual offender, MICH. COMP. LAWS § 769.12, to a term of 18-40 years' imprisonment on the robbery conviction, a concurrent term of 90 days in jail on the illegal entry conviction, and a mandatory consecutive term of two years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT SCORED 10 POINTS ON OV-4; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

II.     THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT FAILED TO TAKE INTO ACCOUNT ALL MITIGATING EVIDENCE IN SENTENCING THE DEFENDANT; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

III.   THE TRIAL COURT UNLAWFULLY VIOLATED THE UNITED STATES AND MICHIGAN CONSTITUTIONS IN SENTENCING THE DEFENDANT TO A PRISON TERM OF 18-40 YEARS ON A HABITUAL OFFENDER 4TH SUPPLEMENT ARISING OUT OF THE ARMED ROBBERY CONVICTION; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

IV.   THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT FAILED/REFUSED TO GRANT HIM THE CORRECT AMOUNT OF JAIL CREDIT AGAINST HIS CURRENT FELONY FIREARM SENTENCE; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

V.   THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT ORDERED HIM TO REIMBURSE THE COUNTY ATTORNEY FEES IT PAID TO TRIAL COUNSEL WITHOUT FIRST HOLDING A HEARING TO DETERMINE IF HE HAD THE PRESENT AND FUTURE ABILITY TO PAY THEM; ON PLAIN ERROR AND/OR INEFFECTIVE ASSISTANCE OF COUNSEL GROUNDS THIS COURT SHOULD REVIEW THIS ISSUE.

VI.   THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS DUE PROCESS, EQUAL PROTECTION, AND OTHER PROTECTED RIGHTS UNDER THE UNITED STATES AND MICHIGAN CONSTITUTIONS WHEN IT ENTERED A JUDGMENT OF CONVICTION AND SENTENCE ON EVIDENCE THAT IS INSUFFICIENT TO SUPPORT THE CONVICTION.

VII.   THE TRIAL COURT UNLAWFULLY DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHTS UNDER US CONST, AMEND VI AND MICH CONST 1963, ART 1, § 20 TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN IT DENIED THE DEFENDANT'S REQUEST TO REPLACE TRIAL COUNSEL.

The court of appeals found no merit to petitioner's claims, and affirmed his convictions and

sentences, although it remanded to the trial court for clarification of petitioner's responsibility to

3

reimburse the county for attorney fees. *See People v. King*, No. 306480, 2013 WL 45691 (Mich. Ct. App. Jan. 3, 2013) (per curiam).

4.     Petitioner sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. King*, 494 Mich. 856, 830 N.W.2d 409 (2013).

5.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on November 25, 2013. As grounds for the writ of habeas corpus, he raises the seven claims that he raised in the state courts.

6.     Respondent filed his answer on March 3, 2014. He contends that petitioner's first four claims are procedurally defaulted, petitioner's fifth claim is unexhausted, and all of petitioner's claims are without merit.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the December 31, 2010, robbery of Jessica Shoemaker in Pontiac, Michigan. The evidence adduced at trial was briefly summarized by the Michigan Court of Appeals:

> Jessica Shoemaker ended her waitressing shift at a Coney Island restaurant on the afternoon of December 31, 2010, and, with her cash tips in hand, entered her vehicle in the parking lot. Defendant approached her vehicle and asked for two or three dollars, which she gave him in change. Defendant then reached in Jessica's window and took all of her tip money from her lap. When he saw Jessica's phone in her hand, he pointed a gun at her and told her "don't even think about it." Defendant then tried to enter the vehicle, but was unable to do so. Jessica called her employer, who was still inside the restaurant and, as he and two customers exited the restaurant and approached defendant, defendant fired two shots in the air then left the parking lot. The police located defendant hiding in the garage of a nearby home shortly thereafter.

*King*, 2013 WL 45691, at *1. The evidence was more fully summarized in the prosecutor's brief

to the Michigan Court of Appeals:

The People's first witness at trial was Jessica Shoemaker, who testified that, on December 31, 2010, she was waitressing at Big Nick's Coney Island on Cesar Chavez Avenue in Pontiac. (August 29, 2011, Transcript, pp 178-80). Ms. Shoemaker testified that all of her pay came in the form of cash – both from the restaurant and the customers, which she would place in her apron. *Id*. at 181. She had about $150 cash on her person at the end of her shift. *Id*. at 182-83. She left work "between 3:30 and 3:45[,]" during daylight hours, and entered her Chevrolet Tracker vehicle. *Id*. at 191. While sitting in her car, she began counting the cash on her person, "put it on my lap and a man walks over to my car." *Id*. at 192. She rolled down her window, and the man "asked for two or three dollars. I told him I didn't have two or three dollars and he proceeded to ask me for just change. And that's when I told him I had change and I reached into my apron and grabbed a good amount of change out and I handed it to him." *Id*. at 193. She identified Defendant as the man who approached her. *Id*. at 194.

Defendant "counted it pretty quickly but he said at that point he only needed ten more cents to make whatever it was that he needed." *Id*. at 194. Ms. Shoemaker told him she did not have 10 additional cents, and Defendant "said there was ten more cents sitting on my passenger seat and pointed." *Id*. at 195. Ms. Shoemaker continued, "I looked over and I went to grab the money, which I don't even know if it was there[,] thinking back on all of it, and he went in my window and snatched all my money off of my lap." *Id*. Defendant was wearing a "black puffy coat and a knitted hat." *Id*. Ms. Shoemaker clarified that she never gave Defendant permission to take the money. *Id*. After he took the money, Ms. Shoemaker said she "begged for him to give me my money back." *Id*. at 196.

[Answer:] After he snatched the money I said, 'Please, give me my money back. What are you doing?' You know, 'What are you doing?' He was acting funny. He was like, 'Oh, calm down. Calm down. I'm going to give you your money back.' And I'm just like, 'Well, give me my money back, please.'

I didn't want to drive away because I really did want my money. And then my phone was in my hand and he seen the phone in my hand and he was like, 'Don't even think about it.' Pulls over his little coat that he had and showed me his gun like this. He pulls it out at me like this.

*Id*. at 197. After she begged Defendant to return the money, Ms. Shoemaker clarified,

he asked me for a ride and I was like, 'You're not getting in my car. You just took all my money.' You – 'You're not getting in my car. I don't even know you.' He then started walking around to the passenger side door. I locked all the doors. And as he was walking around I put my phone down like this so he couldn't see and started scrolling down to my boss' number and called him and left it down

5

there so he could hear what was going on because they were still in the building.

*Id*. at 198. Defendant produced the gun "after he seen the phone in my hand and he thought I – believed I was calling the police, I thought. That's why he probably showed it to me." *Id*. Defendant "pull[ed] out his gun; he points at me and says, 'Don't even think about it.'" *Id*. at 199. Ms. Shoemaker testified she was "shocked" when this happened. *Id*.

Defendant then walked around to the passenger side of the vehicle and tried to open the door, but was unable to "because the door handle is not there." *Id*. Defendant tried entering via one of the back doors, but the back doors were locked. *Id*. Defendant then returned to Ms. Shoemaker's driver's-side window. *Id*.

Around this time, Ms. Shoemaker telephoned her boss, Nikola Memcaj, who, along with another employee and two customers, exited the restaurant and began approaching her car. *Id*. at 200. Upon encountering the three individuals, Defendant was "acting like he didn't know anything. He starts walking towards [a] side street, a little bit, but he's not quite there yet when they walk up." *Id*. at 201. Ms. Shoemaker exited her car because "I wanted to get inside. Get every cop called, call my mom. Just get away from it all." *Id*. She saw her boss approaching Defendant, and Defendant "put his hand in the air with the gun and shot it a couple of times and Nick [Memcaj] backed off and walked back towards the Coney as well." *Id*. at 202. Ms. Shoemaker testified she heard two gun shots and had no doubt that it was a gun that she saw on Defendant. *Id*. Ms. Shoemaker said the gun was black but was unsure of its exact size, explaining "it's about as big as my hand." *Id*. Ms. Shoemaker then had this exchange with the prosecutor:

> [Question:] Okay. When he produced the gun, what were you thinking?
> [Answer:] I was scared. The first time he produced the gun I was scared he was going to take my life away.
> Q: Did you ever attempt to take the money back from him?
> A: No.
> Q: Why not?
> A: Because I didn't want him to shoot me.

*Id*. at 203. Ms. Shoemaker then returned to the restaurant, where she began crying. *Id*. at 204. She went inside the coney island and awaited the police. *Id*.

During cross-examination, Ms. Shoemaker admitted she was not sure if Defendant had asked for $2 or $3 worth of change. *Id*. at 207. Ms. Shoemaker acknowledged that she did not mention in her statement to the police that Defendant pointed a weapon at anyone, or that he shot his gun in the air. *Id*. at 208. Ms. Shoemaker explained that she "forgot some things." *Id*. at 207. Ms. Shoemaker admitted she is accustomed to individuals asking for change in the neighborhood. *Id*. at 212. Defendant did not threaten her before he reached into Ms. Shoemaker's car for the money. *Id*. at 213.

The People's next witness was Mr. Memcaj, the owner of Big Nick's Coney Island and Ms. Shoemaker's boss. *Id*. at 237-38. Both he and Ms. Shoemaker were

working on December 31, 2010. *Id*. at 239-40. Mr. Memcaj said Ms. Shoemaker left the restaurant around 3:25 or 3:30 p.m., and Mr. Memcaj remained inside having coffee with some customers. *Id*. at 242. He received a phone call from Ms. Shoemaker around 3:35 or 3:40 p.m., "and she's screaming and crying. Yelling, 'Get away from me. Stop.' Just screaming." *Id*.

Inside the store with Mr. Memcaj were customers Marty Tovar and Charles Hicks, and Randy Aguilera, an employee. *Id*. at 242-43. Upon hearing Ms. Shoemaker's screams on the phone, Mr. Memcaj tried to get her attention, but "she wouldn't answer me. Just screaming and yelling." *Id*. at 243. He looked out the windows of the coney island, and saw Ms. Shoemaker parked and "a gentleman there standing at her window." *Id*. at 244. He continued:

> So, of course, I get up and I go out there and he starts backing away. 'We don't have a problem here. We don't have a problem.' And I'm getting closer, he's tell[ing] me, 'I have a gun.' I think he's lying. He's probably a homeless guy out there, okay, who wants money and stuff. So he keeps – 'I've got a gun, man.' I'm thinking he's lying again, so I get closer and he pulls it out and shoot[s] twice, okay, in the air.'

*Id*. Mr. Memcaj said there were no cars blocking his view of Ms. Shoemaker's vehicle from inside the restaurant. *Id*. Mr. Memcaj identified the shooter in the courtroom as Defendant. *Id*. at 248. Mr. Memcaj said he had heard gunshots and there was "[n]o doubt in my mind it was a gun." *Id*. at 248-49. Immediately, "I froze. I mean, I stopped. I mean, I don't know. Scared I guess." *Id*. at 249. He returned to the restaurant and asked his wife to call the police. *Id*. Mr. Memcaj described Defendant's gun as "a .32 or a .38[, a] small gun. It wasn't big." *Id*. at 252. On cross-examination, Mr. Memcaj testified Ms. Shoemaker told him, "I just got robbed. He robbed me." *Id*. at 258. On redirect examination, Mr. Memcaj testified Ms. Shoemaker was "screaming, hysterical" as Defendant was yelling to him, "'We don't have a problem here. Everything is cool.'" *Id*.

After Mr. Memcaj completed his testimony, Charles Hicks, a frequent customer at Big Nick's, took the stand. (August 30, 2011, Transcript, pp 10-11). Mr. Hicks said he would often stay at the restaurant with his uncle, Marty Tovar, and converse with Mr. Memcaj. *Id*. at 11. On December 31, 2010, he testified, he was at the restaurant with his uncle, Mr. Memcaj, Mr. Memcaj's wife and Randy Aguilera. *Id*. at 11. Mr. Hicks testified that around 2:30 p.m. he saw Ms. Shoemaker leave the restaurant and approach her vehicle as he remained inside drinking coffee. *Id*. at 12-13. He said "he looked outside and I saw that she was still there and that she was sitting there arguing." *Id*. at 13. "You could just see Jessica arguing the way she talks." *Id*. Mr. Hicks identified Defendant in the courtroom as the person with whom Ms. Shoemaker was arguing outside. *Id*. Soon, the phone rang inside the restaurant. Mr. Hicks said, "I saw Nick he had this like, 'what the heck' look on his face and then he started walking out and Randy [Aguilera] noticed, and he followed behind." *Id*. at 14. Mr. Hicks and Mr. Tovar soon followed behind. *Id*. Soon, Messrs. Memcaj and Aguilera were yelling that "she was robbed" and he saw Defendant "reached at

his waist, says, 'I have a gun.'" *Id*. at 16. He further explained:

> And then we started walking, actually, I'm telling him to give the
> money back, and then we followed to approximately right there. He
> stopped right there. We were like, 'give her the money back. Give her
> the money back.' And he just went for his pistol, or at this waistband.

*Id*. at 16-17. Mr. Hicks, who testified he has a license to carry a concealed weapon,
said he displayed his weapon and "[t]hat's when my uncle pulled me away, told me
to, [']he might have other people,['] so I put my weapon back." *Id*. at 17. The group
stopped following Defendant at that point. *Id*. at 20. Mr. Hicks soon heard three
gunshots after Defendant had jumped the fence into a junkyard adjacent to the
restaurant's parking lot. *Id*. Mr. Hicks testified there was "no question" but that
Defendant had a gun and no question that he heard gunfire when Defendant was in
the junkyard. *Id*. at 23. The police soon arrived and began searching for Defendant
and tracked him to the home of Josue Perez on Gordon Avenue, where Defendant
soon emerged near the garage. *Id*. at 27-28. During cross-examination, Mr. Hicks
testified he did not see Defendant discard any money or weapons. *Id*. at 37. On
re-cross-examination, he testified that he did not hear any gunshots when he first saw
Mr. Memcaj talking to Defendant. *Id*. at 40.

The People's next witness was Mr. Tovar, who testified he was at Big Nick's
Coney Island with his nephew, Mr. Hicks, on December 31, 2010. *Id*. at 43-44. Mr.
Tovar said Mr. Memcaj received a phone call around 3:30 or 3:45 p.m. ,soon after
Ms. Shoemaker quit for the day, and, upon looking out the window, Mr. Tovar
concluded "they got a problem with the gentleman out there[.]" *Id*. at 44-45. "[S]o
we ran out afterwards and she was coming, getting out of the car, we come up, and
Nick's like, '[S]tay back. He's got a gun.'" *Id*. at 44-45. They continued in
Defendant's direction until Defendant said, "'[Y]ou guys better get back[,]' and he
pulls up his jacket, or shirt and shows us his gun." *Id*. at 45. Defendant started
backing up, Mr. Tovar kept approaching him, and then Defendant "ran between two
houses, so we come up again, I told my nephew to stay back, because we're not
hiding behind nothing, I said, in case he pulls it out, I don't want to get shot." *Id*.
Defendant soon "bolt[ed] out between the houses and goes through a junk yard." *Id*.

Mr. Tovar described the gun as "a silver gun and he just had it tucked in his
belt." *Id*. at 49. It was a "silver revolver" with a wooden handle, and he recognized
the gun as a revolver because of the shape of the cylinder. *Id*. Mr. Tovar said he had
a license to carry a concealed weapon and had zero doubt that Defendant had a gun.
*Id*. at 51. After Defendant "flashed" the gun, Defendant hopped across a wooden
fence bordering the parking lot and into the adjacent junkyard. *Id*. Mr. Tovar jumped
in Ms. Shoemaker's car, picked up Mr. Hicks and they began driving in the direction
Defendant had run. *Id*. at 52. Mr. Aguilera did the same. They soon found Defendant
in an alleyway off Corwin Avenue. *Id*. at 52-53. Defendant said, "You guys better
stay back[.]" *Id*. at 53. Defendant soon escaped into the houses. Officers soon found
him at Mr. Perez's home, in the garage. *Id*. at 55.

On cross-examination, Mr. Tovar acknowledged he never saw Defendant fire
the gun. *Id*. at 57. He assisted the officers in searching for a weapon after

Defendant's arrest, but never saw him discard the weapon. *Id*. at 59. On redirect examination, Mr. Tovar explained that about 20 or 25 minutes had elapsed between Defendant's flashing of the weapon and his arrest . *Id*. at 60.

Mr. Perez, the People's next witness, testified he was at home on the afternoon of December 31, 2010, when he noticed a police officer walking from his driveway to the garage. *Id*. at 65. Upon sighting Mr. Perez, the officer "told me not to get out, to stay in the house." *Id*. Police soon emerged from his garage with someone in their custody. *Id*. at 67. He assisted the officers in searching for a gun and some money in the garage, but were unable to find it. *Id*. at 68. Mr. Perez soon observed that the door handle to his garage was broken. Mr. Perez testified that the handle was not broken before this incident and that he never gave Defendant permission to enter his garage. *Id*. at 69.

Deputy Sheriff Craig Pesko of the Oakland County Sheriff's Office (OCSO), who was, on December 31, 2010, a canine officer with the Pontiac Police Department, also testified. *Id*. at 69-71. The deputy said he responded to a dispatch for assistance in the area of Gerdon Avenue to find a suspect in an armed robbery. *Id*. at 72. His dog obtained a scent from a footprint in the snow and tracked the scent to a garage behind 31 Gordon Ave., where the deputy's partner "located a black male laying on the ground in the garage near a vehicle." *Id*. at 73. Deputy Pesko further testified that that he and his partner, upon approaching the home, found the door unsecured. *Id*. at 75. He identified Defendant as the individual he found in the garage. *Id*. at 76. Neither Deputy Pesko nor his partner located a gun or money on Defendant's person . *Id*.

Deputy Sheriff Shedrick Bell, also of OCSO, was a patrol officer with the Pontiac Police Department on December 31, 2010. *Id*. at 83. He heard a dispatch of an armed robbery at Big Nick's Coney Island and "responded to the area where they said they had the suspect cornered." *Id*. at 85. They began a search of the area on foot. *Id*. at 87-88. The canine unit tracked to the garage at 31 Gerdon, and Deputy Bell soon heard his colleagues ordering Defendant off the ground . *Id*. at 89. He presented Defendant to Messrs. Tovar and Hicks at the scene of the crime, and both individuals identified Defendant as the culprit. *Id*. at 90. The People then rested their case. *Id*. at 96.

Defense counsel moved for a directed verdict, arguing that defendant "is guilty of the charge of larceny from the person or unarmed robbery[]" but that "the People did not present enough testimony to find him guilty of [] the most serious [] charge of robbery armed." *Id*. at 100. The judge denied the motion, finding that Ms. Shoemaker "testified extensively that she was in fact placed in fear; that she believed defendant had a weapon[.]" *Id*. at 101-02. "[W]hether or not the weapon was utilized in the force of the robbery, the Court believes[,] is a question of fact for the trier of fact[.]" *Id*. at 102. Defendant rested without calling any witnesses. *Id*. at 103.

Pl.-Appellee's Br. on Appeal, in *People v. King*, No. 306480 (Mich. Ct. App.), at 2-10; *see also*,

Def.-Appellant's Br. on Appeal, at 2-6.

C.      *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

10

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529

U.S. at 412).  The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Sentencing Claims (Claim I-V)*

In his first five claims, petitioner raises a number of challenges to his sentence.  The Court should conclude that petitioner's claims are without merit.[1]

---

[1]Respondent contends that petitioner's first four claims are barred by petitioner's procedural default in the state courts.  With respect to these claims, the Michigan Court of Appeals concluded that the claims were not preserved by a proper objection in the trial court, and thus were reviewable only for plain error.  Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The court of appeals's reliance on the contemporaneous objection rule renders these claims procedurally defaulted.  *See Engle v. Isaac*, 456 U.S. 107, 125-129 (1982) (state

1.    *Guideline Scoring (Claim I)*

Petitioner first contends that the trial court erred in scoring Offense Variable 4 (OV-4) in computing the Michigan sentencing guidelines.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.  A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987).  Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored or departed from the guidelines range raises

---

contemporaneous objection rule is adequate procedural bar precluding consideration of habeas claims). Further, this conclusion is not altered by the fact that the Michigan Court of Appeals did consider the merits of petitioner's claims.  It is clear that the court of appeals did so only in the context of determining whether petitioner could establish plain error to overcome his procedural default.  "[P]lain error review by the state court does not constitute a waiver of procedural default rules." *White v. Mitchell*, 431 F.3d 517, 525 (6th Cir. 2005); *see also, Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001).  Nevertheless, it is necessary to consider the merits of these claims.  With respect to each sentencing claim, petitioner contends that trial counsel was ineffective for failing to raise a proper objection.  As the Supreme Court has observed, "in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice" to establish cause. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Consideration of counsel's effectiveness, however, depends in part on consideration of petitioner's underlying claims.  Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

In analyzing the merits of these claims, the deferential standard of review set forth in § 2254(d) applies, notwithstanding that the court of appeals found the claims defaulted.  The court of appeals addressed the merits of each claim in determining whether petitioner could establish plain error to excuse his default.  The Sixth Circuit has "squarely endorsed the view that 'a federal constitutional claim reviewed by a state court for "plain error" can be considered "adjudicated on the merits" for the purpose of receiving deference under AEDPA.'" *Bond v. McQuiggan*, 506 Fed. Appx. 493, 498 n.2 (6th Cir. Nov. 29, 2012) (quoting *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009)).

13

issues of state law that are not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review). Thus, petitioner is not entitled to habeas relief on his claims relating to the trial court's scoring of, or departure from, the Michigan sentencing guidelines.

Moreover, even if this claim were cognizable, petitioner cannot show that the trial court erred in scoring the guidelines. Petitioner challenges the scoring of OV-4. This offense variable requires the assessment of 10 points if "[s]erious psychological injury requiring professional treatment occurred to a victim." MICH. COMP. LAWS § 777.34(1)(a). "In making this determination, the fact that treatment has not been sought is not conclusive." MICH. COMP. LAWS § 777.34(2). Here, as explained by the court of appeals, the victim testified at trial that she was afraid, "her employer testified that he heard Jessica screaming and crying," and in the presentence report interview the victim "stated that she had been very fearful since the robbery." *King*, 2013 WL 45691, at *2. These statements from the victim regarding the psychological impact of the crime on her were sufficient to support the scoring of OV-4. *See People v. Gibbs*, 299 Mich. App. 473, 493, 830 N.W.2d 821, 831 (2013); *People v. Williams*, 298 Mich. App. 121, 124, 825 N.W.2d 617, 673 (2012). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.     *Failure to Consider Mitigating Evidence (Claim II)*

Petitioner next claims that the trial court failed to consider mitigating evidence in imposing

14

sentence, such as his mental status and his rehabilitative potential. The Court should conclude that petitioner is not entitled to habeas relief on this claim. Although the Supreme Court has held that individualized sentencing is required in the death penalty context, *see, e.g.*, *Tuilaepa v. California*, 512 U.S. 967, 972 (1994); *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), these cases "have repeatedly suggested that there is no comparable requirement outside the capital context, because of the qualitative difference between death and all other penalties." *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (citing *Eddings v. Oklahoma*, 455 U.S. 104, 110-112 (1982); *Rummel v. Estelle*, 445 U.S. 263, 272 (1980); *Lockett v. Ohio*, 438 U.S. 586, 602-05 (1978); *Woodson*, 428 U.S. at 303-05). Based on these cases, the *Harmelin* Court explicitly declined to extend the individualized sentencing requirement to non-capital cases. *Harmelin*, 501 U.S. at 996 ("We have drawn the line or required individualized sentencing at capital cases, and see no basis for extending it further."); *see also*, *id.* at 1006 (Kennedy, J., concurring). Likewise, nothing in the Constitution requires a state to establish its system of criminal sanctions to give primacy to any one penological goal. *See Harmelin*, 501 U.S. at 999 (Kennedy, J.) ("[T]he Eighth Amendment does not mandate adoption of any one penological theory."). Thus, the trial court's alleged failure to consider mitigating factors in imposing petitioner's sentence provides no basis for habeas relief.

      3.    *Inaccurate Information (Claims II & III)*

In both his second and third claims, petitioner argues that the trial court sentenced him on the basis of inaccurate information, both because OV-4 was improperly scored and because the court failed to consider mitigating factors. This claim is without merit. In *Townsend v. Burke*, 334 U.S. 736 (1948), and *United States v. Tucker*, 404 U.S. 443 (1972), "the United States Supreme Court invalidated defendants' sentences because they were imposed by trial courts in reliance upon

15

material false assumptions of fact." *Eutzy v. Dugger*, 746 F. Supp. 1492, 1504 (N.D. Fla. 1989) (discussing *Townsend* and *Tucker*); *accord Stewart v. Peters*, 878 F. Supp. 1139, 1144 (N.D. Ill. 1995) (same). *See generally*, *Tucker*, 404 U.S. at 448-49; *Townsend*, 334 U.S. at 740-41. It is well established, however, that a *Tucker* violation arises only where the improper information "actually served as the basis for the sentence." *United States v. Jones*, 40 Fed. Appx. 15, 17 (6th Cir. 2002) (internal quotation omitted); *see also*, *Lechner v. Frank*, 341 F.3d 635, 639 (7th Cir. 2003); *United States v. Johnson*, 767 F.2d 1259, 1276 (8th Cir. 1985). "A sentencing court demonstrates reliance on misinformation when the court gives 'explicit attention' to it, 'found[s]' its sentence 'at least in part' on it, or gives 'specific consideration' to the information before imposing sentence." *Lechner*, 341 F.3d at 639 (quoting *Tucker*, 404 U.S. at 444, 447). Thus, to be entitled to habeas relief on this claim petitioner "must show that the sentencing court actually relied on this information and that it was materially false." *Hanks v. Jackson*, 123 F. Supp. 2d 1061, 1074 (E.D. Mich. 2000) (Gadola, J.).

Petitioner does not point to any materially false information that the trial court relied upon in imposing its sentence. Rather, petitioner contends that the trial court misscored the guidelines, and relied on facts to which he did not admit, in imposing its sentence. These arguments raise claims of legal error in imposing sentence, but they do not identify any materially false factual information upon which the trial court relied. Petitioner's challenge, in other words, is to the trial court's various legal determinations; he does not argue that those legal determinations were based on materially inaccurate factual information. Thus, petitioner cannot show that his sentence was based on any materially inaccurate information. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

16

4.      *Apprendi (Claim III)*

Also in his third claim, petitioner suggests that the trial court erred in imposing sentence on the basis of facts not found by the jury, in violation of *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  The Michigan Court of Appeals rejected this claim, finding *Blakely* and *Apprendi* inapplicable to Michigan's indeterminate sentencing scheme. *See King*, 2013 WL 45691, at *3.  This determination was reasonable.

In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  *Apprendi*, 530 U.S. at 490.  In *Blakely*, the Court considered the applicability of *Apprendi* to a state sentencing guidelines scheme similar to the United States Sentencing Guidelines.  The state in that case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing which increased the statutory maximum penalty to which the defendant was exposed.  The Court in *Blakely* rejected this argument and struck down the state guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*  In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original).  Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt.

17

*See Booker*, 543 U.S. at 233, 237-43.

*Blakely* and *Apprendi*, however, are inapplicable here. Michigan law provides for an indeterminate sentencing scheme, unlike the determinate sentencing schemes at issue in *Blakely* and *Booker*. Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence. The maximum sentence is not determined by the trial judge but is set by law. *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); MICH. COMP. LAWS § 769.8. "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790. Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing MICH. COMP. LAWS § 769.34(2)). Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a reasonable doubt (or be themselves pleaded to by a defendant). As explained above, unlike the guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the minimum portion of a defendant's indeterminate sentence. The maximum is, in every case, the statutory maximum authorized by law. *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286

18

n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction on the armed robbery charge, therefore, contained all of the factual findings necessary to impose the statutory maximum (life imprisonment) on that charge. *See Drohan*, 475 Mich. at 162, 715 N.W.2d at 790 ("Thus, the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict.").

This being the case, petitioner's sentence did not violate *Blakely*. The Supreme Court has repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea. As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557. This distinction is important because the only issue under the Sixth Amendment is whether the judge is impinging on the role of the jury. For this reason, the Court explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in *Blakely*. Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

> Justice O'Connor argues that, because determinate sentencing schemes involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his

19

> sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted). Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment, as both the Sixth Circuit and the Michigan Supreme Court have repeatedly held. *See Montes v. Trombley*, 599 F.3d 490, 496-97 (6th Cir. 2010); *Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009); *Drohan,* 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

This conclusion is not altered by the Supreme Court's more recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013). In that case, the Court overruled *Harris*, and extended *Apprendi* to facts that increase a mandatory minimum sentence. Reasoning that the *Harris* Court's distinction between facts that increase the statutory maximum and facts that increase a mandatory minimum is inconsistent with *Apprendi*, the Court in *Alleyne* held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 133 S. Ct. at 2155 (citation omitted). The Court was careful to note, however, that its ruling "does not mean that any fact that influences judicial discretion must be found by a jury." *Id*. at 2163. Judges retain broad discretion to impose any sentence within the range authorized by law based on the jury's findings (or the facts admitted in a plea), and may judicially find facts in exercising this discretion. *See id*.

20

*Alleyne* is inapplicable here. *Alleyne* dealt with statutory mandatory minimum sentences, as opposed to facts used to determine the minimum sentence of an indeterminate sentencing scheme such as Michigan's sentencing scheme. Therefore, "[i]t is questionable whether *Alleyne* applies to Michigan's sentencing scheme." *Spears v. Curtin*, No. 1:13-cv-1013, 2013 WL 5636625, at *6 (W.D. Mich. Oct. 16, 2013); *see also*, *Jackson v. Haas*, No. 4:13-CV-10724, 2014 WL 1652339, at *17 (Mar. 31, 2014) (Komives, M.J.), *magistrate judge's report and recommendation adopted*, 2014 WL 1652341 (E.D. Mich. Apr. 24, 2014) (Berg, J.); *People v. Herron*, 303 Mich. App. 392, ___, ___ N.W.2d ___, 2013 WL 6508495, at *4-*6 (Mich. Ct. App. Dec. 12, 2013). More importantly, even if *Alleyne* now bars judicial factfinding under the Michigan sentencing scheme, it does not constitute "clearly established federal law" under § 2254(d)(1) for purposes of petitioner's claim. At the time the Michigan Court of Appeals rejected petitioner's *Apprendi* claim, *Alleyne* had not been decided and the Court's decision in *Harris* made clear that the Michigan Court of Appeals's rejection of petitioner's claim was proper.[2] The rule of *Alleyne* was not clearly established at the time the state courts rejected petitioner's claim, and thus it provides no basis for habeas relief under § 2254(d)(1). *See Kittka v. Franks*, 539 Fed. Appx. 668, 672 (6th Cir. 2013); *Jackson*, 2014 WL 1652339, at *17; *Williams v. Smith*, No. 11-15163, 2014 WL 632437, at *7 (E.D. Mich. Feb. 18, 2014) (Lawson, J., adopting report and recommendation of Komives, M.J.); *Stockman v. Berghuis*, No. 2:10-CV-14860, 2013 WL 6885121, at *14 (E.D. Mich. Dec. 31, 2013). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

---

[2]Petitioner's appeal was decided by the Michigan Court of Appeals on January 3, 2013. *Alleyne* was not decided until June 17, 2013. Under § 2254(d)(1), the relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim. *See Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011). Even if it were not, the Michigan Supreme Court denied petitioner's application for leave to appeal on May 28, 2013, also before the decision in *Alleyne*.

5.      *Proportionality (Claim III)*

Petitioner further argues in his third claim that his sentence was disproportionate to his offense.  The Michigan Court of Appeals's rejection of this claim, *see King*, 2013 WL 45691, at *3, was reasonable, and thus petitioner is not entitled to habeas relief.  In *Solem v. Helm*, 463 U.S. 277 (1983), the Supreme Court held that the Eighth Amendment requires that "a criminal sentence be proportionate to the crime for which the defendant has been convicted." *Id.* at 290. In considering whether a sentence is proportionate, the Court identified three objective factors which are relevant: "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for the same crime in other jurisdictions." *Id.* at 292. Applying this test to the facts before it, the Court found that the defendant's sentence of life imprisonment without possibility of parole under a habitual offender statute was disproportionate where the three underlying felonies were nonviolent crimes involving small sums of money, the final felony being for uttering a false check. *See id.* at 303.  However, the reach of *Solem* has been limited by the Supreme Court's more recent decisions.  In *Harmelin v. Michigan*, 501 U.S. 957 (1991), the Court held that Michigan's mandatory sentence of life imprisonment for possession of over 650 grams of a controlled substance did not violate the Eighth Amendment. Justice Scalia, joined by Chief Justice Rehnquist, reasoned that *Solem* was wrongly decided and should be overruled, and concluded that the Eighth Amendment contains no proportionality requirement outside the capital punishment context. *See Harmelin*, 501 U.S. at 965 (Scalia, J.). Justice Kennedy, joined by Justices O'Connor and Souter, concluded that the Eighth Amendment contains a very narrow proportionality principle, which prohibits only those punishments which are 'grossly' disproportionate to the crime. *See id*. at 1001 (Kennedy, J.).

Further, Justice Kennedy's opinion distinguished *Solem*, essentially limiting application of the *Solem* objective criteria test to the facts in that case. *See id.* at 1001-05. Specifically, Justice Kennedy concluded that the objective analysis required in *Solem* is "appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality." *Id.* at 1005-06.[3] Thus, it is unclear whether, and to what extent, *Solem* remains good law. *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir. 1992) ("By applying a head-count analysis, we find that seven members of the Court supported a continued Eighth Amendment guaranty against disproportional sentences. Only four justices, however, supported the continued application of all three factors in *Solem*, and five justices rejected it. Thus, this much is clear: disproportionality survives; *Solem* does not.").

As the Sixth Circuit has summarized, under *Harmelin*, "although only two Justices [Rehnquist and Scalia] would have held that the eighth amendment has no proportionality requirement, five Justices [Kennedy, O'Connor, and Souter, along with Rehnquist and Scalia] agree that there is no requirement of strict proportionality." *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991). At most, then, the Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001; *Hopper*, 941 F.2d at 422 ("the eighth amendment is offended only by an extreme disparity between crime and sentence"). Thus, as a general matter, "one could argue without fear of contradiction by any decision of the [Supreme] Court that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of sentence actually imposed

---

[3] Justices White, Blackmun, Stevens, and Marshall all concluded that *Solem* should be upheld, and the three factor test applied to the sentencing scheme at issue. *See Harmelin*, 501 U.S. at 1016 (White, J., dissenting).

23

is purely a matter of legislative prerogative." *Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *see Harmelin*, 501 U.S. at 962-65 (Scalia, J.); *id*. at 997-1001 (Kennedy, J.)

More recently, the Supreme Court again considered the proportionality issue under the Eighth Amendment, resulting in a split similar to that reached in *Harmelin*. In *Ewing v. California*, 538 U.S. 11 (2003), a three-justice plurality reaffirmed Justice Kennedy's approach in *Harmelin*, concluding that the Eighth Amendment contains a narrow proportionality principle which forbids sentences which are grossly disproportionate to the offense. *See id.* at 23-24 (opinion of O'Connor, J.) Justice O'Connor was joined in this position by Justice Kennedy, who had authored the plurality opinion in *Harmelin*, and by Chief Justice Rehnquist, who in *Harmelin* had joined Justice Scalia in concluding that the Eighth Amendment contains no proportionality requirement outside of the capital sentencing context. Justice Scalia, now joined by Justice Thomas (who was not on the Court when *Harmelin* was decided), reaffirmed his view that the Eighth Amendment contains no proportionality guaranty. *See id*. at 32 (opinion of Scalia, J.); *id*. at 32 (opinion of Thomas, J.). Justice Stevens likewise reaffirmed his view from *Harmelin* that the three-factor test of *Solem* guides the proportionality inquiry under the Eighth Amendment. Justice Stevens was joined in this view by Justice Souter, who had joined the plurality opinion of Justice Kennedy in *Harmelin*, as well as by Justices Ginsburg and Breyer, who were not on the Court when *Harmelin* was decided. *See id.* at 33-35 (opinion of Stevens, J.); *id*. at 36-37 (opinion of Breyer, J.).  Thus, although the particular Justices attached to each position have changed somewhat, the numbers and rationales in *Ewing* break down precisely as they did in *Harmelin*. Thus, for purposes of habeas review, the Sixth Circuit's analysis of *Harmelin*, in which this Court asks only whether the sentence is grossly disproportionate to the offense, *see Coleman v. DeWitt*, 282 F.3d 908, 915 (6th Cir. 2002); *United*

*States v. Baker*, 197 F.3d 211, 217 (6th Cir. 1999), remains controlling under *Ewing*.

Here, the *Harmelin* plurality's "threshold comparison" of petitioner's crime and the sentence imposed, does not "lead to an inference of gross disproportionality," *Harmelin*, 501 U.S. at 1005, and thus the Court should conclude that petitioner is not entitled to habeas relief on this ground. Petitioner was sentenced to a term of 18-40 years' imprisonment for an armed robbery in which he brandished a gun, placed the victim in fear, and fired his gun into the air. Petitioner was sentenced to a term of 18-40 years' imprisonment for an armed robbery, a crime carrying a potential sentence of life imprisonment, *See* MICH. COMP. LAWS § 750.529, which involved his placing the victim in fear, brandishing a gun, and firing his gun into the air. In these circumstances, petitioner's sentence of 25-40 years' imprisonment is not grossly disproportionate to his offense. *See, e.g.*, *Little v. Butler*, 848 F.2d 73, 77 (5th Cir. 1988) (25 year sentence for attempted armed robbery not disproportionate); *United States v. Oglesby*, 764 F.2d 1273, 1279 (7th Cir. 1985) (20 year sentence for armed robbery); *Hanks v. Jackson*, 123 F. Supp. 2d 1061, 1075 (E.D. Mich. 2000) (Gadola, J.) (20-50 year sentence for armed robbery); *Atkins v. Overton*, 843 F. Supp. 258, 261-62 (E.D. Mich. 1994) (Gadola, J.) (10-30 year sentence for armed robbery). In addition, petitioner had a number of prior convictions, subjecting him to punishment as a fourth habitual offender. *See Lockyer v. Andrade*, 538 U.S. 63, 73-77 (2003) (upholding sentence of 25 years' to life imprisonment for theft under recidivist statute); *Ewing*, 538 U.S. at 28-30 (same); *Rummel v. Estelle*, 445 U.S. 263, 284-85 (1980) (mandatory sentence of life imprisonment under recidivist statute not disproportionate where defendant's three qualifying convictions were all nonviolent theft offenses involving a total of less than $230). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

25

6.      *Jail Credit (Claim IV)*

In his fourth claim, petitioner contends that the trial court erred in failing to give credit for time served in jail prior to the imposition of his sentence.  The Michigan Court of Appeals rejected this claim, reasoning that under MICH. COMP. LAWS § 769.11b, a defendant is not entitled to credit for time served when he is jailed for an unrelated offense.  The court explained that "when a parolee commits a new crime while on parole, the time he or she spends in jail awaiting sentence for the new crime is credited against the paroled crime," and concluded that because petitioner "was on parole when he was arrested for the current offenses[,] . . . the trial court did not err when it denied [him] jail credit against his new prison sentences for the time served while awaiting trial on the current offenses."  *King*, 2013 WL 45691, at *4.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Michigan's jail credit statute provides:

> Whenever any person is hereafter convicted of any crime within this state and has served any time in jail prior to sentencing because of being denied or unable to furnish bond for the offense of which he is convicted, the trial court in imposing sentence shall specifically grant credit against the sentence for such time served in jail prior to sentencing.

MICH. COMP. LAWS § 769.11b.  However, in *People v. Idziak*, 484 Mich. 549, 773 N.W.2d 616 (2009), the Michigan Supreme Court held that

> the jail credit statute does not apply to a parolee who is convicted and sentenced to a new term of imprisonment for a felony committed while on parole because, once arrested in connection with the new felony, the parolee continues to serve out any unexpired portion of his earlier sentence unless and until discharged by the Parole Board. For that reason, he remains incarcerated regardless of whether he would otherwise be eligible for bond before conviction on the new offense. He is incarcerated not "because of being denied or unable to furnish bond" for the new offense, but for an independent reason. Therefore, the jail credit statute, MCL 769.11b, does not apply.

26

*Id*. at 562-63, 773 N.W.2d at 624.  Because petitioner committed his offense while on parole, as a matter of state law he was not entitled to credit against his sentence for the time served prior to his sentencing on the new offense, as the court of appeals correctly held.  It is well established that habeas corpus is not available to remedy a state court's error in the application of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws.").  "[T]he interpretation of state crediting statutes is a matter of state concern and not a proper function of a federal court under its habeas corpus jurisdiction." *Travis v. Lockhart*, 925 F.2d 1095, 1097 (8th Cir. 1991); *see also*, *Howard v. White*, 76 Fed. Appx. 52, 53 (6th Cir. 2003); *Coates v. Bell*, No. 08-13773, 2010 WL 522841, at *8 (E.D. Mich. Feb. 9, 2010).  Thus, petitioner is not entitled to habeas relief based on the trial court's failure to grant him credit against his minimum term of imprisonment for the time spent in custody prior to sentencing.

Nor can petitioner show that the failure to grant him credit for this time violated the Double Jeopardy Clause.  The Fifth Amendment to the United States Constitution commands that no "person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V.  The Double Jeopardy Clause, which is applicable to the states through the Due Process Clause of the Fourteenth Amendment, *see Benton v. Maryland*, 395 U.S. 784, 794 (1969), provides three basic protections: "[It] protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S.

711, 717 (1969) (footnotes omitted).  "These protections stem from the underlying premise that a defendant should not be twice tried or punished for the same offense."  *Shiro v. Farley*, 510 U.S. 222, 229 (1994) (citing *United States v. Wilson*, 420 U.S. 332, 339 (1975)).  Where a claim is made that a defendant is being twice punished for the same offense, the question becomes one of legislative intent.  "Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent."  *Ohio v. Johnson*, 467 U.S. 493, 499 (1984) (citations omitted).  If the legislature intended to impose the multiple punishments, the "court's inquiry is at an end" and there is no double jeopardy violation.  *Id*. at 499 n.8.  In making this determination, the Court is bound by the Michigan courts' interpretation of state law.  *See Rodgers v. Bock*, 49 Fed. Appx. 596, 597 (6th Cir. 2002); *Banner v. Davis*, 886 F.2d 777, 780 (6th Cir. 1989).

As the Michigan Supreme Court explained in *Idziak*, here the Double Jeopardy Clause is not implicated because no multiple punishment has been imposed for the same offense.  Contrary to petitioner's argument, his time spent in custody prior to sentencing was not a criminal punishment for the new offense, for which he was later sentenced.  Rather, as a matter of state law, the time spent in custody was merely a continuation of his earlier sentence for which he was on parole.  Thus, there was no double jeopardy violation.  *See Idziak*, 484 Mich. at 570, 773 N.W.2d at 628; *see also*, *Franklin v. Curtin*, No. 2:08-CV-13274, 2010 WL 2232228, at *4 (E.D. Mich. May 27, 2010) (Rosen, J.); *Wiillavize v. Howes*, No. 1:09-cv-62, 2009 WL 4639483, at *4 (W.D. Mich. Dec. 2, 2009).

Nor did the failure to grant petitioner credit violate his right to equal protection of the laws. As Judge Rosen explained in rejecting this same claim:

Petitioner also claims that the denial of sentence credit violates the Equal Protection Clause. The Equal Protection Clause mandates that all persons, who are similarly situated, should be treated alike. See *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985). Nevertheless, "[t]o withstand Fourteenth Amendment scrutiny, statutes that do not interfere with fundamental rights or single out suspect classifications must bear only a rational relationship to a legitimate state interest." *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002), citing *City of Cleburne*, 473 U.S. at 440. Federal courts have consistently held that prisoners do not constitute a suspect class. *See Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000). In addition, there is no fundamental right at issue. *See Grays v. Lafler*, 618 F. Supp. 2d 736, 747 (W.D. Mich. 2008) (citing *Hansard v. Barrett*, 980 F.2d 1059, 1062 (6th Cir. 1992)).

Legislation which does not classify by race, alienage, national origin, or gender and which does not impinge on personal rights protected by the Constitution need only be rationally related to a legitimate state interest. *Cleburne*, 473 U.S. at 440. Under the rational basis standard, the challenging party bears the burden of demonstrating that there is no rational connection between the legislation and a legitimate state interest. *See Harrah Independent School Dist. v. Martin*, 440 U.S. 194, 198 (1979).

In the case of parolees who commit new crimes while serving a term of parole, the State has a legitimate interest in applying credit for time served to the remainder of the sentences for their previous offenses, that is, enforcing its laws in a way that protects its citizens from recidivists. *See Wiillavize v. Howes*, No. 1:09-cv-62, 2009 WL 4639483 at *4 (W.D. Mich. Dec.2, 2009). "Sentencing laws that prescribe consecutive sentences on parolees who commit new crimes while on parole are rationally related to that objective. And detaining parolees on parole holds while the new crimes are adjudicated is a rational choice as well." *Holloway v. Trombley*, No. 05-cv-10276, 2009 WL 270166, *9 (E.D. Mich. Feb.3, 2009). Thus, the Court finds no violation of the Equal Protection Clause.

*Franklin*, 2010 WL 2232228, at *3-*4 (parallel citations omitted).  Because the denial of credit does not implicate a suspect classification or a fundamental right, and because it is rationally related to a legitimate state interest, the failure to grant credit to petitioner did not violate the Equal Protection Clause.  *See Franklin*, 2010 WL 2232228, at *3-*4; *Wiillavize*, 2009 WL 4639483, at *3-*4; *Holloway v. Trombley*, No. 05-CV-10276, 2009 WL 270166, at *9-*10 (E.D. Mich. Feb. 3, 2009) (Lawson, J.); *Idziak*, 484 Mich. at 570-74, 773 N.W.2d at 628-30.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

7.    *Imposition of Fees (Claim V)*

Finally, petitioner contends that the trial court erred in imposing attorney fees pursuant to

MICH. COMP. LAWS § 769.1k[4] without considering his ability to pay.  The Court should conclude

that petitioner is not entitled to habeas relief on this claim.[5]  In *People v. Jackson*, 483 Mich. 271,

769 N.W.2d 630 (2009), the Michigan Supreme Court held that a defendant's constitutional rights

are not violated when a trial court fails to hold a hearing to determine an indigent defendant's ability

to reimburse the state for court-appointed attorney fees at the time the court imposes an order to pay.

Rather, the constitution requires only that an ability-to-pay hearing be held at the time of

enforcement of the order.  *See Jackson*, 483 Mich. at 286-93, 769 N.W.2d at 639-43.  Consistent

with this rule, on remand from the court of appeals the trial court clarified that petitioner's liability

for fees extended only to fees for appellate counsel, and that "[i]f the Defendant is incarcerated at

the time efforts to collect the appellate fees begin, the Court finds that the Michigan Department of

---

[4]Section 769.1k requires a sentencing court to "impose the minimum state costs as set forth in" § 769.1j, which in turn provides for a minimum state cost of $68.00 in the case of a felony conviction. MICH. COMP. LAWS § 769.1k(1)(a) (citing MICH. COMP. LAWS § 769.1j).  Section 769.1k further authorizes, but does not require, the imposition of "[a]ny fine," "[a]ny cost in addition to the minimum state cost," and "[t]he expenses of providing legal assistance to the defendant."  MICH. COMP. LAWS § 769.1k(b).

[5]Respondent contends that this claim is unexhausted because petitioner did not reassert this claim after the trial court, on remand from the court of appeals, clarified petitioner's responsibility to pay fees.  The Court need not resolve this issue.  Exhaustion is not jurisdictional, and thus despite the exhaustion requirement a habeas petition "may be *denied* on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(2) (emphasis added).  A federal court may decide a habeas petition on the merits when the grounds for relief are without merit or are not cognizable on habeas review.  *See Cain v. Redman*, 947 F.2d 817, 820 (6th Cir. 1991); *Prather v. Rees*, 822 F.2d 1418, 1421-1422 (6th Cir. 1987).  Indeed, in these circumstances the court should dismiss the non-federal or frivolous claim on its merits to save the state courts the useless review of meritless constitutional claims.  *See Cain*, 947 F.2d at 820.  As explained below, petitioner's claim relating to the imposition of fees is clearly meritless, and thus the Court should deny the claim on the merits rather than requiring further review in the state courts.

30

Corrections will make an ability to pay determination in accordance with *People v. Jackson*[.]"
*People v. King*, No. 11-236933-FC (Oakland County, Mich., Cir. Ct. Jan. 9, 2013).

The habeas statute provides that a federal court may entertain a habeas application from a
state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or
treaties of the United States." 28 U.S.C. § 2254(a).  Because an order imposing fees or costs has no
bearing on the validity or duration of a prisoner's custody, a challenge to such an order is not
cognizable under § 2254.  *See Washington v. McQuiggin*, 529 Fed. Appx. 766, 772-73 (6th Cir.
2013); *Ashby v. Paine*, 317 Fed. Appx. 641, 642 (9th Cir. 2008); *Gray v. Perry*, No. 10-cv-13340,
2010 WL 3952848, at *2 (E.D. Mich. Oct. 7, 2010) (Duggan, J.).  Accordingly, the Court should
conclude that petitioner is not entitled to habeas relief on this claim.

E.     *Sufficiency of the Evidence (Claim VI)*

In his sixth claim, petitioner contends that the evidence was insufficient to support his armed
robbery conviction.  The Court should conclude that petitioner is not entitled to habeas relief on this
claim.

1.     *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against
conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the
crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA
standard for habeas review of sufficiency of the evidence challenges, "the relevant question is
whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier
of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson
v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the

31

evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. "[I]t is the responsibility of the jury–not the court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam). The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319). Likewise, a reviewing court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence." *United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S. 394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story."). It is the job of the jury, not this Court sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the jury resolved those conflicts in favor of the prosecution. *See Jackson*, 443 U.S. at 326. As the Court has explained, "the only question under *Jackson* is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065.[6] Under the amended version of § 2254(d)(1) a federal habeas court's review is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (per curiam). A state court's decision that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference under AEDPA." *Coleman*, 132 S. Ct. at 2065; *see also*, *Cavazos*, 132 S. Ct. at 4.

While a challenge to the sufficiency of the evidence on an established element of an offense

---

[6] Although *Jackson* and *Coleman* involved sufficiency of the evidence reviews of jury verdicts, the same standard is applied to verdicts rendered in bench trials. *See United States v. Bronzino*, 598 F.3d 276, 278 (6th Cir. 2010).

raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard . . . has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "under *Jackson*, federal courts must look to state law for 'the substantive elements of the criminal offense,' but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 132 S. Ct. at 2064 (citation omitted) (quoting *Jackson*, 443 U.S. at 324 n.16). Under Michigan law, the elements of armed robbery are: (1) an assault, (2) a felonious taking of property from the victim's presence or person, (3) while the defendant is armed with a weapon described in the statute. *See Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004) (Gadola, J.), *aff'd*, 173 Fed. Appx. 437 (6th Cir. 2006); *People v. Smith*, 478 Mich. 292, 319, 733 N.W.2d 351, 365 (2007).

> 2.    *Analysis*

Petitioner contends that the evidence was insufficient to show that he was armed or that he committed an assault (by placing the victim in fear) because the victim testified that she did not see the gun, nor was she afraid, when the victim committed the larceny by reaching into her car to grab her money. It was only after the money had been taken, when petitioner was attempting to get into her car, that the victim saw the gun and became afraid. The court of appeals rejected this claim, concluding that the testimony of the four witnesses that they observed a gun was sufficient to establish the elements of armed robbery. *See King*, 2013 WL 45691, at *4. This determination was reasonable.

In *People v. Randolph*, 466 Mich. 532, 648 N.W.2d 164 (2002), the Michigan Supreme

Court interpreted the Michigan unarmed robbery statute, and rejected the long standing "transactional approach" to robbery which had been adopted by the Michigan Court of Appeals. Under that approach, any use of force used in conjunction with a larceny, even if to facilitate an escape with the stolen goods after the larceny had already occurred, satisfied the force element of the robbery statute.  The Michigan Supreme Court, based on the language of the unarmed robbery statute, concluded that this approach was erroneous, and that the force required by the statute must precede or accompany the unlawful taking; force used to retain the property after the initial larceny is not sufficient.  *See Randolph*, 466 Mich. at 536, 648 N.W.2d at 167.  Although *Randolph* dealt only with the unarmed robbery statute, the Michigan Court of Appeals subsequently extended the holding to the armed robbery statute.  *See People v. Scruggs*, 256 Mich. App. 303, 662 N.W.2d 849 (2003).  Under the rule of *Randolph* and *Scruggs*, therefore, "the evidence must establish that the assault [and possession of a weapon] occurred before, or contemporaneous with, the taking of the property."  *People v. Scruggs*, 256 Mich. App. 303, 310, 662 N.W.2d 849, 853 (2003).  Were *Randolph* and *Scruggs* a correct explication of Michigan law at the time of petitioner's offense, his sufficiency of the evidence claim might have merit.  The Michigan legislature responded to *Randolph* and *Scruggs*, however, by amending the unarmed and armed robbery statutes to overturn those decisions.  *See* 2004 Mich. Pub. Acts 128 (July 1, 2004).  Under the amended statute, "in the course of committing a larceny" "includes acts that occur in an attempt to commit the larceny, or during the commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property."  MICH. COMP. LAWS § 750.530(2) (unarmed robbery statute); *see also*, MICH. COMP. LAWS § 750.529 (defining armed robbery by reference to the "conduct proscribed under section 530.").  This amendment "codified the

34

transactional theory" rejected in *Randolph*. *People v. Smith-Anthony*, 494 Mich. 669, 686, 837 N.W.2d 415, 424 (2013).

Under this transactional approach as defined in the statute, it is clear that the prosecution presented sufficient evidence to prove beyond a reasonable doubt that petitioner assaulted the victim and was armed with a weapon "during the commission of the larceny, or in flight or attempted flight after the commission of the larceny." MICH. COMP. LAWS § 750.530(2). The victim testified that after petitioner took the money from her lap, he pointed the gun at her to prevent her from using the phone and tried to get into her car, causing her to fear for her safety. The eyewitnesses likewise testified that petitioner brandished his gun at both the victim and them, and that he fired shots into the air as he was fleeing. As the Supreme Court has explained, the *Jackson* standard does not permit "fine-grained factual parsing" of the evidence by a reviewing court, *Coleman*, 132 S. Ct. at 2064, nor does it permit this Court to reweigh the conflicts in the evidence or assess the credibility of the witnesses. The trier of fact was free to draw any reasonable inferences from the evidence, and to resolve the conflicts in the evidence in favor of the prosecution. In light of the testimony of the victim and the eyewitnesses, it cannot be said that the jury's verdict was "so insupportable as to fall below the threshold of bare rationality." *Coleman*, 132 S. Ct. at 2065. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.    *Counsel Claims (Claims I-V, VII)*

Petitioner next raises several claims relating to his trial counsel. In Claim VII, petitioner contends that he was denied his right to counsel by the trial court's refusal to appoint substitute counsel. In Claims I-V, petitioner contends that counsel was ineffective for failing to raise his sentencing claims. The Court should conclude that petitioner is not entitled to habeas relief on these

claims.

    1.    *Substitute Counsel (Claim VII)*

*a.  Clearly Established Law*

The Sixth Amendment provides, in relevant part, that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."  U.S. CONST. amend. VI.  The Sixth Amendment right to counsel contemplates a corollary right to the counsel of one's choice, and thus a criminal defendant who has the desire and the financial means to retain his own counsel generally "'should be afforded a fair opportunity to secure counsel of his choice.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1351 (6th Cir. 1993) (quoting *Powell v. Alabama*, 287 U.S. 45, 53 (1932)).  However, as the Supreme Court has explained, "the right to counsel of choice does not extend to defendants who require counsel to be appointed for them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006).  Further, the right to counsel of one's choice is not absolute, and "is circumscribed in several important respects." *Wheat v. United States*, 486 U.S. 153, 159 (1988).  Importantly, the right to counsel of one's choice "must be balanced against the court's authority to control its own docket, and a court must beware that a demand for counsel may be utilized as a way to delay proceedings or trifle with the court." *United States v. Krzyske*, 836 F.2d 1013, 1017 (6th Cir. 1988); *see also*, *Gonzalez-Lopez*, 548 U.S. at 151-52; *Lockett v. Arn*, 740 F.2d 407, 413 (6th Cir. 1984) ("Although a criminal defendant is entitled to a reasonable opportunity to obtain counsel of his choice, the exercise of that right must be balanced against the court's authority to control its docket.").  Further, as the Supreme Court has explained, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each

criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159.  Thus, "in evaluating Sixth Amendment claims, 'the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such.'" *Id*. (quoting *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984).  Because an indigent defendant has no absolute right to appointed counsel of his choice, and because the focus of the Sixth Amendment inquiry is on effective advocacy, "[a] criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the attorney and the defendant." *Smith v. Lockhart*, 923 F.2d 1314, 1320 (8th Cir. 1991); *accord United States v. Blaze*, 143 F.3d 585, 593 (10th Cir. 1998); *United States v. Iles*, 906 F.2d 1122, 1130 (6th Cir. 1990).

### b. Analysis

Prior to the preliminary examination, petitioner requested the appointment of substitute counsel, indicating his belief that counsel was not properly representing him.  The district judge rejected petitioner's request, concluding that counsel had not had a chance to represent him yet because he had been sent to the Forensic Center for a competency evaluation, and that if the case were bound over petitioner could renew his request in the circuit court.  *See* Preliminary Exam. Tr., at 4-9.  Petitioner renewed his request in the circuit court.  As explained in the prosecutor's brief on appeal:

> Prior to trial in circuit court, Defendant renewed his request for a substitution of court-appointed counsel.  (July 5, 2011, Transcript, p 3).  Defendant told the court "me and my attorney, we've been having problems from the start."  *Id*. at 3.  He continued,
>> [M]e and him been arguing back-and-forth.  I feel he's not representing me right.  I try to ask him questions, my wife, my

37

> parents try to ask him questions.  He brushed them off.  I tried to talk
> to him.  It's like he don't want to talk to me.  I ask him to do certain
> things [] for me.  He don't want to do them and I feel he's not going
> to represent me with my case.  I'm facing a serious case right here for
> something that I didn't do, but I feel that he's not representing me
> right, your Honor.
>
> *Id*. at 3-4.  Defense counsel responded that he and Defendant "had serious
> discussions.  I've sent him to the forensic center and he's come back competent."
> *Id*. at 4.  "Mr. King and I have had discussions about his mental competency and that
> type of thing, but they have been satisfied, as far as I'm concerned, in regards to the
> forensic center."  *Id*.
>
> Circuit Judge Denise Langford-Morris denied Defendant's request.  *Id*. at 5.
> "I've know Mr. Wilson a long time.  He practices law in this Court every[]day.
> There's nothing that's come to this Court's attention that would render Mr. Wilson
> incompetent at this junction that he hasn't done or failed to do in light of
> representing you."  *Id*. at 5-6

Pl.-Appellee's Br., in *People v. King*, No. 306480 (Mich. Ct. App.), at 2.  The Michigan Court of

Appeals rejected petitioner's claim, reasoning that petitioner "did not iterate a difference of opinion

between him and trial counsel regarding trial tactics and did not establish any good cause for

substitution of counsel," and concluding therefore that the "trial court did not abuse its discretion

when it denied defendant's request for new counsel."  *King*, 2013 WL 45691, at *5.  This

determination was reasonable.

Here, petitioner failed to establish good cause for substitution of counsel, "such as a conflict

of interest, an irreconcilable conflict, or a complete breakdown in communication between the

attorney and the defendant."  *Smith*, 923 F.2d at 1320.  Petitioner does not allege that there was any

irreconcilable conflict between himself and counsel, or that counsel was acting with a conflict of

interest.  While petitioner does contend that there was a breakdown in communication, he does not

allege the type of complete breakdown for which substitute counsel is warranted.  It is clear that

petitioner's problems with counsel amounted to no more than a disagreement with the tactics and

strategy counsel chose to adopt.  This is insufficient to constitute the type of complete breakdown

justifying appointment of substitute counsel. *See United States v. Carillo*, 161 Fed. Appx. 790, 793 (10th Cir. 2006); *cf. Morris v. Slappy*, 461 U.S. 1, 13-14 (1983) (there is no constitutional right to a "meaningful attorney-client relationship.").

Further, even assuming that the trial court erred by not granting petitioner's request for substitute counsel, petitioner's claim fails because any error was harmless. As noted above, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably by represented by the lawyer whom he prefers." *Wheat*, 486 U.S. at 159. Thus, the courts that have considered the issue have concluded that "[u]nless [a defendant] can establish an ineffective assistance claim under *Strickland v. Washington* . . . any error in the [trial] court's disposition of [the defendant's] motion for appointment of substitute counsel is harmless." *United States v. Graham*, 91 F.3d 213, 217 (D.C. Cir. 1996) (citing *Strickland v. Washington*, 466 U.S. 668 (1984)); *see also*, *United States v. Calderon*, 127 F.2d 1314, 1343 (11th Cir. 1997); *United States v. Zillges*, 978 F.2d 369, 372-73 (7th Cir. 1992); *Bowie v. Renico*, No. 00-10013, 2002 WL 31749162, at *11 (E.D. Mich. Nov. 6, 2002) (Lawson, J.); *Stephens v. Costello*, 55 F. Supp. 2d 163, 172 (W.D.N.Y. 1999). As the Supreme Court has explained, "those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Because, as explained below, petitioner was not deprived of the effective assistance of counsel, he has "no cognizable complaint."

2.    *Ineffective Assistance (Claims I-V)*

a.  *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect

the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id*. at 687. These two components are mixed questions of law and fact. *Id*. at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.* With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*. at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id*. at 695. It is petitioner's burden to establish the elements of his ineffective assistance of counsel claim. *See United States v. Pierce*, 63 F.3d 818, 833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v. Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

As the Supreme Court has recently explained, *Strickland* establishes a high burden that is

difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review

a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).

### b. *Analysis*

Petitioner contends that trial counsel was ineffective for failing to raise each of his

sentencing challenges in the trial court. With respect to each claim, the court of appeals found that

the underlying claim was meritless, and thus counsel was not ineffective for failing to make a

groundless objection at sentencing. *See King*, 2013 WL 45691, at *2, *3, *4. This determination

41

was reasonable.  With respect to petitioner's sentencing claims asserting errors of state law, the

Michigan Court of Appeals rejected each of petitioner's claims and found no error of state law.  In

analyzing petitioner's ineffective assistance of counsel claims, these expressions of state law are

binding on this Court.  *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999).  *See*

*generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824

(9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal

habeas action.").  With respect to petitioner's sentencing claims premised on the United States

Constitution, as explained above each of those claims is without merit as a matter of federal law.

Thus, each of the objections to his sentence that petitioner contends counsel should have raised is

meritless.  Because it is well established that counsel cannot be deemed ineffective for failing to

raise a meritless objection, *see Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006);

*Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir.

1993), petitioner is not entitled to habeas relief on these claims.

G.	*Recommendation Regarding Certificate of Appealability*

	1.	*Legal Standard*

	As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides

that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge

issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that

"[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing

of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  As the Sixth Circuit has noted, this

language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S.

880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a

certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue.  Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84.  Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable."  *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254.  The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue."  FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments.  In light of the new Rule 11 requirement that the Court either

43

grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

    2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability.  As explained above, it is clear that petitioner's challenges to the trial court's scoring of the sentencing guidelines, failure to consider mitigating evidence, failure to give jail credit, and imposition of fees present state law claims that are not cognizable on habeas review.  It is also clear that the *Apprendi* rule does not apply to Michigan's indeterminate sentencing scheme, and that petitioner has failed to identify any false information upon which his sentence was based.  Thus, the resolution of petitioner's sentencing claims is not reasonably debatable.  And because the resolution of these underlying claims is not reasonably debatable, it follows that the conclusion that counsel was not ineffective for failing to raise these claims is likewise not reasonably debatable.  Because there was abundant evidence that petitioner was armed and put the victim in fear during the commission of the robbery (under the transactional approach to robbery reflected in MICH. COMP. LAWS §§ 750.529, .530), the resolution of his sufficiency of the evidence claim is not reasonably debatable.  Finally, because petitioner failed to show good cause for substitution of appointed counsel, and because any error in the failure to appoint substitute counsel was harmless in light of the fact that counsel rendered effective assistance, the resolution of petitioner's substitute counsel claim is not reasonably debatable.  Accordingly, the Court should deny petitioner a certificate of appealability.

H.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

## III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: May 6, 2014                            s/Paul J. Komives_____
                                              PAUL J. KOMIVES
                                              UNITED STATES MAGISTRATE JUDGE

I hereby certify that a copy of the foregoing document was sent to parties of record on May 6, 2014, electronically and/or by U.S. mail.

s/Michael Williams_____
Case Manager for the
Honorable R. Steven Whalen